**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

HUGO HOLMES,             )
                               )
         Plaintiff,        )
                               )       Case No. 09-cv-2481
         v.              )
                               )       Judge Robert M. Dow, Jr.
CITY OF CHICAGO, *et al.*,     )
                               )
         Defendants.     )
                               )

**MEMORANDUM AND OPINION ORDER**

Before the Court are Plaintiff's *Daubert* motion to bar expert testimony by Dr. Richard McPartlin [243], Plaintiff's motions *in limine* [258], [259], [260], [261], [262], and Defendant's motions *in limine* [257], including Defendant's motion to bar expert testimony by Dr. Edward Keuer [257 No. 9, at 18]. For the reasons set forth below, Plaintiff's *Daubert* motion to bar expert testimony by Dr. Richard McPartlin [243] is denied. Defendant's motion [257 No. 9, at 18] to bar expert testimony by Dr. Edward Keuer is denied.

Plaintiff's motion [258] to bar reference to harassment allegations by Donna Smith is granted. Plaintiff's motion [259] to bar testimony of citizen complaints about prostitution is granted. Plaintiff's motion [260] to bar evidence of disciplinary action for misuse of his work computer is granted in part and denied in part. Plaintiff's motion [261] to bar reference to Defendant's cancer condition is granted. Plaintiff's omnibus motion *in limine* [262] is granted in part and denied in part: the Court grants Plaintiff's motion No. 1 [262, at 1], motion No. 2 [262, at 1], motion No. 3 [262, at 1–2], motion No. 4 [262, at 2], motion No. 5 [262, at 2], motion No. 7 [262, at 2], motion No. 8 [262, at 2–3], motion No. 9 [262, at 3], motion No. 10 [262, at 3–4],

motion No. 11 [262, at 4], and motion No. 12 [262, at 4]; the Court denies Plaintiff's motion No. 6 [262, at 2].

Defendant's motions *in limine* [257] are granted in part and denied in part: the Court grants Defendant's motion No. 4 [257, at 5], motion No. 5 [257, at 9], and motion No. 10 [257, at 22]; the Court grants in part and denies in part Defendant's motion No. 1 [257, at 1], motion No. 2 [257, at 3], motion No. 3 [257, at 4], motion No. 6 [257, at 11], motion No. 7 [257, at 16], and motion No. 8 [257, at 17]. This case remains set for a jury trial to commence on November 7, 2016.

## I.    Background

On the morning of April 25, 2008, Plaintiff Hugo Holmes was arrested and charged with solicitation of a sex act. At the time of Plaintiff's arrest, Defendant Chicago Police Officer Michelle Acosta, along with other Chicago police officers who are no longer defendants in this suit, [see 181, 217], were conducting a "prostitution solicitation sting operation" to arrest individuals who solicited a sex act from a police officer impersonating a prostitute. Defendant's role was to act as a "decoy" prostitute and signal to Officer Herrera when a person solicited her for a sex act. The officers would then make an arrest for solicitation of a sex act. Officer Herrera's role was to watch for Defendant's signal and to protect her safety. Officer Matich and Officer Coffee were to park their unmarked police car out of sight of a potential offender and wait for a radio transmission from Officer Herrera indicating that a person had solicited a sex act from Defendant.

At the time of his arrest, Plaintiff was a Field Service Supervisor of the Chicago Department of Transportation's ("CDOT") Division of Infrastructure Management, for CDOT's Central District. On April 25, 2008, Plaintiff was working in the Central District, which

included the intersection of 47th Street and Washtenaw. At approximately, 8:30 a.m., Plaintiff was driving his 2006 GMC pickup truck eastbound on 47th Street. After passing the intersection at 47th Street and Washtenaw, Plaintiff drove around the block as follows: he took a left turn on Talman Avenue (the next block east from Washtenaw) and proceeded one block north to 46th Street; Plaintiff then turned left and proceeded one block west on 46th Street to Washtenaw Avenue and took another left turn and proceeded one block southbound on Washtenaw Avenue until he came to a stop at approximately 4658 S. Washtenaw Avenue.

Plaintiff testified that a woman walked toward his pickup truck while he was stopped on Washtenaw and 47th Street and stated, "$20 for a blowjob?" Plaintiff denies that he solicited a sex act and further testified that he ignored Defendant's solicitation with disgust and a dismissive gesture, telling her, "I'm working." In contrast, Defendant testified that Plaintiff offered her $20 in exchange for "head" and to "lick her titty." Plaintiff did not see Defendant wave or gesture with her hand when he was stopped and he did not look back at her when he drove away. Defendant testified that she signaled Officer Herrera that Plaintiff had solicited her for a sex act. Officer Herrera then told Officers Matich and Coffee over the radio that Plaintiff solicited a sex act from Defendant.

Plaintiff drove his pickup truck across 47th Street and southbound on Washtenaw. Officers Matich and Coffee pulled their unmarked police car out of the ally off of Washtenaw south of 47th Street and stopped Plaintiff. The officers arrested Plaintiff and charged him with solicitation of a sex act in violation of 720 ILCS 5/11-14.1-A, and his car was impounded pursuant to Chapter 8-8-060 of the Chicago Municipal Code.[1] Plaintiff remained in custody until he posted bond at approximately 4:00 p.m. on April 25, 2008.

---

[1] In the course of performing his field monitoring and inspections for work, Plaintiff used his own vehicle and was reimbursed by CDOT for his mileage.

The underlying criminal case against Plaintiff, *People v. Hugo Holmes*, No. 08 MC1 222705, was called for a jury trial in the Circuit Court of Cook County, Illinois, Municipal Department, First District, in late September 2008. However, the State decided not to pursue the charge of prostitution solicitation. Plaintiff also took part in a municipal administrative proceeding before an Impound Hearing Officer to recover his impounded vehicle. Plaintiff prevailed and received a full refund of the impoundment fees. Finally, since Plaintiff was a City employee, the Inspector General's Office of the City of Chicago conducted an investigation of Plaintiff's alleged conduct. In the end, the Inspector General concluded that the investigation should be "closed not sustained."

Plaintiff filed the instant lawsuit, bringing a claim against Defendant Officer Michelle Acosta pursuant to 42 U.S.C. § 1983 for false arrest in violation of the Fourth Amendment, as well as state law claims for malicious prosecution and intentional infliction of emotional distress. The Court previously dismissed Plaintiff's other claims against Defendant Acosta and the other officers. [181, 217.] In addition to bringing the individual claims, Plaintiff alleged liability on the part of Defendant City of Chicago ("the City"). See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1976).

The City moved to bifurcate [50] Plaintiff's *Monell* claims against the City from the claims against Defendant Acosta and to stay discovery against it on the *Monell* claims until the resolution of all claims against Defendant Acosta. On April 14, 2011, the Court granted the City's motion pursuant to the parties' agreement to bifurcate discovery. See [52.] On November 17, 2015, after considering the parties' status reports [222, 223] articulating their views on whether the Court should postpone trial as to Plaintiff's *Monell* claim until the claims against Defendant Acosta are resolved, the Court ruled that it should continue to defer further litigation

of Plaintiff's *Monell* claim until the conclusion of trial on Plaintiff's claims against Defendant Acosta.

A jury trial is set to begin on November 7, 2016. The claims to be tried at that time are Plaintiff's false arrest, malicious prosecution, and intentional infliction of emotional distress claims against Defendant Acosta.

## II. *Daubert* Motions [243] and [257, No. 9]

Portions of the damages Plaintiff claims relate to an outbreak of herpes zoster, commonly known as shingles, with complications of post-herpetic neuralgia (subsequent nerve pain sometimes resulting from shingles). Plaintiff claims that his shingles were caused by the stress of his arrest and the related proceedings and that the condition leaves him in a state of chronic physical discomfort. Defendant has disclosed Dr. McPartlin as a witness who may be called to provide expert testimony that Plaintiff's shingles were not caused by the stress of his arrest.

Plaintiff argues that Dr. McPartlin's should be barred from testifying pursuant to Federal Rule of Evidence 702 because his opinion is based on faulty research, an incomplete and unscientific methodology, and was formed without fully considering all of the salient facts. [243.] Plaintiff intends to call his expert, Dr. Edward Keuer, to offer his opinion that stress was the primary cause of Plaintiff's shingles. Defendant moves to bar Dr. Keuer's testimony, arguing that his opinion is purely speculative. [257, Defendant's Motion No. 9.] The Court will address each expert in turn.

### A. Legal Standard

Federal Rule of Evidence 702[2] and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the

---

[2] Federal Rule of Evidence 702 states:

admissibility of expert testimony.  *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015).  The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Rule 702 requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis. *Id.* at 809; see also *Daubert*, 509 U.S. at 589.  The Seventh Circuit has stressed that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]"  *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original).

To determine whether expert testimony is admissible, the district court must ascertain (1) whether the expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.  *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011).  "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard."  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  *Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's

---

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or a determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593–94; see also *Bielskis*, 663 F.3d at 893. However, the test for reliability is flexible, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142; see also *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable").

### B. Analysis

#### 1. Plaintiff's Challenge to Dr. McPartlin [243]

Defendant has disclosed Dr. McPartlin as an expert witness who may be called to testify that Plaintiff's shingles were not caused by the stress of his allegedly false arrest. Plaintiff argues that the testimony of Dr. McPartlin should be barred because the testimony is not based on sufficient facts or data and is not the product of reliable principles and methods. Dr. McPartlin states in his expert disclosure report:

> After reviewing the medical records and deposition transcripts provided to me, it is my opinion, to a reasonable degree of medical certainty, that Mr. Holmes' April 24, 2010 Shingles diagnosis, and, therefore, his Post-herpetic Neuralgia, arising 2 years after his April 25, 2008 arrest, are not related to the stress of his arrest and subsequent sequelae of the arrest. Although in medical literature there are anecdotal reports of Shingles following periods of "perceived" stress, the onset of such cases of Shingles are proximally related to the stressful event, and are not observed more than 12 months following the stressful event.

[245, Exhibit 6, at 2.]

Plaintiff does not challenge Dr. McPartlin's qualifications, and the Court concludes that Dr. McPartlin is qualified to testify about the cause of Plaintiff's shingles. Dr. McPartlin has been a board-certified physician in internal medicine for more than thirty-five years and has

treated hundreds of patients with shingles.  [245, Exhibit 2, at 73.]  As an internist, he specializes in the diagnosis of adult diseases and the treatment of nonsurgical adult diseases.  [245, Exhibit 2, at 44–45.]  Plaintiff also does not challenge the relevance of Dr. McPartlin's testimony.  The Court agrees that reliable testimony on this subject would assist the jury in understanding shingles and post-herpetic neuralgia, the risk factors for developing these medical conditions, and whether Plaintiff's arrest caused his outbreak of shingles and post-herpetic neuralgia.

Plaintiff argues that Dr. McPartlin's testimony is unreliable because it is not based on sufficient facts or data and is not the product of reliable principles and methods.  First, Plaintiff contends that Dr. McPartlin did not take into account the sequelae of the arrest and the stress that these subsequent events could have caused Plaintiff.  [245, at 5.]  According to Plaintiff, Dr. McPartlin reached his conclusion simply based on the timing of the arrest in April 2008 and Plaintiff's outbreak of shingles in April 2010.  Since Defendant's counsel suggested that Dr. McPartlin read certain highlighted sections of Plaintiff's deposition, Plaintiff argues that Dr. McPartlin "relied entirely on spoon-fed facts" when forming his expert opinion.  [245, at 7.] Plaintiff also criticizes Dr. McPartlin for not speaking with or examining Plaintiff to obtain necessary information.  [245, at 8–9.]

The Court does not find these arguments for excluding Dr. McPartlin's proposed testimony convincing.  Although Dr. McPartlin conceded that he did not read Plaintiff's entire deposition and read only the highlighted portions suggested by Defendant's counsel and the pages surrounding these highlighted portions, [245, Exhibit 2, at 33–34], Dr. McPartlin was aware of and considered the sequelae of the arrest.  In his expert disclosure report, Dr. McPartlin states his opinion that Plaintiff's shingles "are not related to the stress of his arrest *and subsequent sequelae of the arrest*."  [245, Exhibit 6, at 2.]  When asked what he meant by

"subsequent sequelae of the arrest," Dr. McPartlin explained during his deposition that he meant "[a]nything that would have happened from the arrest * * * in this case, I guess the impounding of his automobile or anything like that, or harassment, as he said. Any subsequent events that might be directly or indirectly from the arrest itself." [245, Exhibit 2, at 100:15–22.] Dr. McPartlin also explained during his deposition that, in his view, the sequelae of the arrest included: (1) the criminal case and the fact that it had been dismissed, [245, Exhibit 2, at 114, 127], (2) the fact that Plaintiff's job was in jeopardy and Plaintiff was under review for a period of time but did not lose his job or any monetary amounts from his job, [245, Exhibit 2, at 113, 127, 129], (3) the current litigation, [245, Exhibit 2, at 115], and (4) the fact that the money from the impoundment had been returned to Plaintiff, [245, Exhibit 2, at 127]. Dr. McPartlin also reviewed Plaintiff's complaint, Defendant's answer, and Plaintiff's answers to responses to Defendant's first set of interrogatories. [245, Exhibit 6, at 3.] Thus, Dr. McPartlin did not ignore the sequelae of the arrest. And, to the extent that Plaintiff believes that Dr. McPartlin based his testimony on cherry-picked facts, he is free to explore that topic on cross-examination at trial.

Nor is it of consequence that Dr. McPartlin did not examine or speak with Plaintiff directly. An expert is not required to examine or speak directly with the Plaintiff to provide reliable expert testimony based on sufficient facts. See Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the *expert has been made aware of* or personally observed." (emphasis added)); *Dana Corp. v. Am. Standard, Inc.*, 866 F. Supp. 1481, 1501 (N.D. Ind. 1994) (noting that deposition testimony is a proper basis for expert testimony); cf. *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020–21 (7th Cir. 2000) (plaintiff's self-reported medical history can be proper basis for expert opinion). Here, Dr. McPartlin reviewed Plaintiff's medical

records from Dr. Silva, who treated Plaintiff's shingles, and Plaintiff's medical records from Dr. Close, who treated Plaintiff's post-herpetic neuralgia and who Plaintiff will present as a fact witness. [245, Exhibit 6, at 3.] Further, he reviewed the entire deposition of Dr. Silva and the entire deposition of Dr. Close. Thus, Dr. McPartlin's testimony is based on sufficient facts and data. See Fed. R. Evid. 702(b).

Next, Plaintiff argues that Dr. McPartlin's testimony is not reliable because it is based on a flawed review of medical literature. Plaintiff contends that "Dr. McPartlin failed to survey published literature, relied on dubious and unknown sources obtained through a brief Google search, and omitted any recording of his research process, rending his opinion woefully inadequate, completely unreliable, and inadmissible." [245, at 10.]

The Court is not convinced that Dr. McPartlin's testimony is based on "a flawed review of medical literature." Dr. McPartlin relied on the medical textbook HARRISON'S PRINCIPLES OF INTERNAL MEDICINE, [245, Exhibit 2, at 20], two dermatology texts/treatises, [245, Exhibit 2, at 21], and around six to eight online articles, [245, Exhibit 2, at 23]. He explained that he specifically looked for information on stress and shingles and only found two articles that dealt with this topic. According to Dr. McPartlin, one article said that stress originally heightens the immune system but that there was no specific evidence on the long term effects. He opined that the other article was inconclusive about the connection between stress and shingles generally but concluded that a stressful event occurring more than six months prior to the shingles outbreak was not a risk factor. [245, Exhibit 2, at 79–80.] Dr. McPartlin also explained that in his review of the medical literature, stress was not mentioned as one of the known risk factors for shingles and stated that he was not familiar with any other literature that identified stress as a known risk factor. Although Plaintiff correctly points out that it is unclear whether the articles Dr. McPartlin

consulted were peer-reviewed, this is merely one of many factors the Court can consider when assessing an expert's methodology. Thus, the Court concludes that Dr. McPartlin's testimony is the product of reliable principles and methods, and the criticisms that Plaintiff offers are appropriate for cross-examination but do not justify exclusion under *Daubert*. Plaintiff's motion is denied.

### 2. Defendant's Challenge to Dr. Keuer [257, No. 9]

Plaintiff intends to call Dr. Keuer as an expert witness to testify that "stress was the primary/trigger cause of [Plaintiff's shingles] (the proximate cause being, of course, the virus itself)." [257, Exhibit 14, at 2.] In Dr. Keuer's opinion, Plaintiff's arrest and the subsequent events caused him stress that reduced his cell-mediated immunity and triggered his shingles infection. Defendant moves to bar Dr. Keuer's expert testimony, arguing that his opinion is purely speculative.

First, Defendant argues that Dr. Keuer's conclusions are outside the scope of his area of expertise as a dermatologist and that Dr. Keuer is unqualified to testify about the connection between stress and shingles because Dr. Keuer is not a specialist in whether a patient's immune system is compromised or in the area of chronic stress. The Court concludes that Dr. Keuer is qualified to offer expert testimony about the cause of shingles. Dr. Keuer is a board certified dermatologist and has taught dermatology at Loyola Stritch School of Medicine for thirty-four years. Dr. Keuer does not need to be a specialist in immunology or chronic stress to offer an expert opinion that stress weakened Plaintiff's immune system, leading to his outbreak of shingles.

Next, Defendant challenges the reliability of Dr. Keuer's methodology, arguing that "[n]one of the literature [reviewed by Dr. Keuer] discusses a stress similar to an arrest," and

"[n]one of the literature supports a finding that ongoing stress arising from the court and administrative proceedings occurring subsequent to Plaintiff's arrest (or a comparable ongoing stress arising from ongoing events such as litigation) could cause the onset of [shingles]." [257, at 21.] This argument fails because the medical literature relied upon by Dr. Keuer does not need to discuss the specific facts of this case: ongoing stress from an arrest and related events, including litigation. Rather, Dr. Keuer could properly apply the principles from the medical literature to the facts of this case. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997) ("Trained experts commonly extrapolate from existing data.").

Finally, Defendant takes issue with Dr. Keuer's elimination of "advanced age" as a shingles risk factor for Plaintiff, who was 58 at the time of diagnosis. [257, Exhibit 15, at 76–77.] However, Dr. Keuer's expert report states that 60 and above would qualify as "advanced age." Further, he explained in his deposition that in his view, "his age is not a high risk factor because the incidence in the 50 to 59 age group is not very high * * *[p]erhaps 3.9 to 4.5 cases per thousand." [257, Exhibit 15, at 76.] Thus, Dr. Keuer gave support for his method of eliminating "advanced age" as a risk factor for Plaintiff. Therefore, the Court concludes that Dr. Keuer's methodology was reliable. Moreover, as with Dr. Partlin, any flaws that Defendant sees in Dr. Keuer's analysis may be explored on cross-examination. For the foregoing reasons, Defendant's motion is denied.[3]

---

[3] Following up on the discussion at the final pre-trial conference, in the event that Dr. Keuer is not available to travel to Chicago to present his testimony in person, Plaintiff's counsel is reminded to make arrangements for Dr. Keuer's testimony to be presented by video conference so that he may be subject to cross-examination before the jury.

**III.    Motions *in Limine***

**A.    Legal Standard**

A motion *in limine* is a motion made "at the outset" or "preliminarily." BLACK'S LAW DICTIONARY 803 (10th ed. 2014).  Motions *in limine* may be used to eliminate evidence "that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997).  The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose." *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009).  The power to rule on motions *in limine* inheres in the Court's role in managing trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  Because motions *in limine* are filed before the Court has seen or heard the evidence or observed the trial unfold, rulings *in limine* may be subject to alteration or reconsideration during the course of trial.  *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989).

**B.    Plaintiff's Motions *in Limine***

**1.    Plaintiff's Motion to Bar Evidence and Testimony Regarding Allegations by Donna Smith of Harassment [258]**

Plaintiff moves to bar evidence and testimony related to allegations by Donna Smith of harassment.  [258.]  Smith previously worked under the supervision of Plaintiff and was subject to discipline by the Department of Transportation for poor job performance.  Plaintiff alleges that Smith spread unfounded rumors that Plaintiff had threatened her that she might lose her job if she did not spend time with him outside of work and accept his advances.  Plaintiff argues that the rumors of harassment are unsupported by any evidence and are irrelevant to the case at hand and should thus be excluded under Federal Rule of Evidence 402.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

Defendant has no objection to this motion, unless Plaintiff opens the door by, for example, arguing or eliciting testimony that he has never been accused of inappropriate behavior by women or has never been accused of misconduct at work. [270, at 1.] Plaintiff accepts this condition. Thus, the Court grants this motion *in limine*, but if Plaintiff opens the door, Defendant will be permitted to bring in evidence of the harassment allegations by Donna Smith.

**2.     Plaintiff's Motion to Bar Evidence and Testimony of Citizen Complaints About Prostitution or Frequency of Prostitution [259]**

Plaintiff moves to bar evidence and testimony about alleged complaints about prostitution or prostitution solicitations. Plaintiff sought discovery of evidence relevant to prostitution, prostitution solicitation, or the frequency of such acts, in the general area of Plaintiff's arrest. The magistrate judge denied Plaintiff's discovery request based on lack of relevance.

Defendant does not intend to introduce evidence relating to citizen complaints of prostitution in the area in which Plaintiff was arrested; rather, Defendant is expected to testify that she and her fellow officers went to that location at their supervisor's direction. Defendant argues that Plaintiff should be barred from suggesting that (1) Defendant and her fellow officers did not have any reasonable basis for choosing 47th Street and Washtena Avenue as the location for their prostitution mission, or (2) Defendant and her fellow officers chose that location for a nefarious reason, such as to target City workers or others who frequently drive through that area in order to falsely arrest them for solicitation of a sex act.

Plaintiff argues that Defendant should be barred from invoking departmental/supervisory directions, regardless of Plaintiff's raising of legitimate questions about the setting and handling of the sting operation.

Since Defendant agrees not to introduce evidence relating to citizen complaints of prostitution in the area in which Plaintiff was arrested, Plaintiff's motion is granted. Plaintiff is

permitted to elicit testimony about how Defendant and her fellow officers set up the prostitution sting operation, why these officers were deployed in the way they were deployed, why they were in that location for the sting operation, and whether their actions and decisions about the location of the operation and other details are consistent with their training and their general understanding of department policy.[4]  As discussed below in relation to Defendant's motion No. 8 to bar reference to the *Monell* claim, Plaintiff's criticism of the sting operation and the City's training and policies for police officers are relevant to the issue of probable cause.  The Court reserves ruling on whether Defendant should be barred from invoking departmental/supervisory authority, as the Court is cognizant of the complications arising from the bifurcation of the *Monell* claims.  The Court will provide further guidance on this issue on the first day of trial and if Defendant believes that she may wish to invoke departmental or supervisory authority at any point during the trial, Defendant must front the issue with the Court and opposing counsel in advance of raising the issue in front of the jury to allow time for discussion and a ruling.

### 3.    Plaintiff's Motion to Bar Evidence of Disciplinary Action for Misuse of Work Computer [260]

In January 2005, the Office of the Inspector General of the City of Chicago undertook an investigation regarding lewd photos on Plaintiff's work computer.  Plaintiff signed a statement admitting that he violated the policy of the CDOT regarding use of computerized equipment by viewing lewd photos on his work computer.  Plaintiff received a twenty-nine day suspension from employment for this violation.  Plaintiff moves to bar any evidence of this disciplinary action, arguing that it is irrelevant under Federal Rule of Evidence 402, inadmissible as

---

[4] As discussed at the final pre-trial conference, no specific policies or General Orders have been identified by either party as relevant to any issues at trial.  Accordingly, although counsel may explore the officers' training and general understanding of proper police policies and procedures, they may not make reference to any specific policies or General Orders.  See also Part C.1 below (ruling on Defendant's *Motion in Limine* 1).

propensity evidence under Rule 404(b), and highly prejudicial and thus should be excluded under Rule 403.

Plaintiff's motion is denied in part. Plaintiff claims that his arrest severely tarnished his reputation and seeks $175,000 in damages for reputational harm and his loss of standing in the community. According to counsel, Plaintiff intends at trial to place before the jury evidence of "who he was, what his credentials are, what kind of person he was" [286 at 47] in support of that claim. In doing so, Plaintiff will make his character and reputation an issue in the case and thus will open the door for Defendant to offer evidence of this disciplinary action to complete the picture. Evidence of the disciplinary action taken against Plaintiff for misuse of his work computer is relevant to damages and to Plaintiff's reputation, and it is sufficiently probative evidence of whether Plaintiff's pre-arrest reputation was as untarnished as he claims as to tip the balance under Rules 401, 402, and 403 in favor of a limited presentation to the jury.[5] Therefore, Plaintiff's motion is denied in part. The Court will allow very limited evidence concerning the disciplinary action, including Plaintiff's signed statement admitting that he violated the CDOT policy by viewing lewd photos on his work computer. See Fed. R. Evid. 801(d)(2) (Statement by a Party Opponent). To the extent that Plaintiff contends that he signed the statement "under pressure," he may elicit testimony explaining the context surrounding the signing of the document.

However, as noted at the final pre-trial conference, the Court will not permit a lengthy sideshow on the issue. See Fed. R. Evid. 403, 611. The jury is not being asked to retry whether Plaintiff should have been disciplined for what was on his work computer. Accordingly,

_____

[5] The scope of affirmative evidence on the alleged damage to Plaintiff's reputation that he chooses to introduce may well affect the extent to which Defendant will be permitted to present her own contrary evidence. In other words, Plaintiff has opened the door and he controls to some extent whether the door will be slightly ajar or more widely open.

Plaintiff's motion is granted in part, and the materials from the IG's file—including the e-mails and attachments of photographs about which Plaintiff has expressed major concern [see 278, at 1-3]—will be excluded under Rule 403. The Court does not believe that the admission of Plaintiff's own statement and the fact of the suspension constitute impermissible propensity evidence. As Plaintiff's counsel noted at the final pre-trial conference [see 286, at 46], lewd ("NSFW") pictures, cartoons, and written materials on the Internet and even in the workplace are rather ubiquitous, a reality that will be as well-known to the jurors as it is to counsel and the Court, and jurors are not likely to infer that because Plaintiff admitted to having pornography on his work computer that he was likely to have solicited a prostitute. However, if Plaintiff wishes to propose a limiting instruction that the limited evidence that the Court will allow on this subject is not to be used for a propensity inference, the Court will be happy to consider it.

### 4. Plaintiff's Motion to Bar Reference to Defendant's Cancer Condition [261]

Plaintiff moves to bar evidence and testimony related to Defendant's testimony about her previous medical leave related to cancer. Plaintiff argues that testimony related to Defendant's condition carries the potential of an inappropriate appeal to the jury's sympathies. Defendant has no objection to this motion, thus Plaintiff's motion *in* is granted.

### 5. Plaintiff's Omnibus Motion *In Limine* [262]

#### a. Plaintiff's Motion No. 1 to Bar All Non-Party Witnesses in this Case from the Courtroom Until After They Have Finished All of Their Testimony [262, at 1]

Defendant does not object to this motion, and thus it is granted.

**b. Plaintiff's Motion No. 2 to Bar Defendant from Introducing Any Documents or Materials Not Previously Provided in Accordance with Plaintiffs' Notices to Produce [262, at 1]**

Defendant objects to this motion as vague, arguing that Plaintiff does not identify any specific document he is seeking to bar. However, Defendant generally agrees that parties should not introduce previously undisclosed documents at trial. Plaintiff's motion is granted.

**c. Plaintiff's Motion No. 3 to Bar Defendant from Introducing at Trial Any Evidence or Testimony of Any Witness Not Heretofore Disclosed As a Witness In Defendant's Answers to Interrogatories [262, at 1–2]**

Plaintiff argues that Defendant included among witnesses Defendant may call Steven Reinke and William Marback, two investigators from the City of Chicago's Inspector General's Office, who were not disclosed to Plaintiff as witnesses. According to Plaintiff, Defendant has said that she may call these two investigators only with respect to the 2004 Disciplinary Action regarding misuse of a work computer. Plaintiff further objects to the testimony of any witnesses from the Inspector General's Office for the reasons discussed above related to Plaintiff's motion to bar evidence of disciplinary action for misuse of his work computer.

Plaintiff's motion is granted to the extent that Defendant is barred from introducing at trial witnesses and evidence not previously disclosed to Plaintiff. Moreover, even if Reinke and Marback had been disclosed, their testimony would be excluded under Rules 403 and 611 because it would violate the Court's ruling above on the limited testimony that will be allowed concerning Plaintiff's misuse of his work computer and his signed statement related to the disciplinary action.

**d. Plaintiff's Motion No. 4 to Bar Reference to Any Offer or Compromise Settlement [262, at 2]**

Defendant does not object to this motion, and thus it is granted pursuant to Federal Rule of Evidence 408.

### e. Plaintiff's Motion No. 5 to Bar Any Comments During Trial, Including Voir Dire, Regarding Plaintiff's Failure to Call a Witness Not Under the Exclusive Direction and Control of the Plaintiff [262, at 2]

Defendant does not object to this motion, and thus it is granted.

### f. Plaintiff's Motion No. 6 to Bar Any Mention of the Pecuniary Circumstances of Any of the Parties [262, at 2]

Plaintiff moves to bar any mention of the wealth of Plaintiff or the poverty of Defendant of the pecuniary circumstances of either party. Defendant objects to this motion *in limine*, arguing that there is no basis to bar Defendant from presenting evidence relating to her financial status as part of her defense against Plaintiff's claim for punitive damages. Defendant does not object to a limiting instruction by the Court that informs the jury that such information should be considered as to the punitive damages claim only. Defendant further argues that if Plaintiff is seeking compensatory damages related to his alleged demotion at work or the alleged damage to his career prospects, Defendant should be able to explore how, if at all, Plaintiff's pecuniary circumstances were affected by the alleged demotion and damage to his career prospects. The Court agrees with Defendant, especially considering that Plaintiff is seeking more than $300,000 in compensatory damages and an additional $250,000 in punitive damages, and the motion is denied.

### g. Plaintiff's Motion No. 7 to Bar Any Assertion That Plaintiff Has Asked for a Greater Amount of Money Than he Actually Expects to be Awarded or Is Entitled To [262, at 2]

Plaintiff seeks to bar Defendant from asserting that an award to Plaintiff would amount to winning the lottery, a welfare program or a "giveaway program," or that Plaintiff's request for damages constitutes any type of get-rich-quick scheme or the like. Defendant objects to this motion as vague and argues that Defendant should be permitted to make arguments about

Plaintiff's motivation for litigation because Plaintiff is asking the jury to award him compensatory and punitive damages.

Plaintiff's motion is granted. The Court agrees that statements regarding why Plaintiff filed this lawsuit are of little or no probative value, and the argument that Plaintiff is seeking more money than he expects to win is improper. See *Rebolledo v. Herr-Voss Corp.*, 101 F. Supp. 2d 1034, 1036 (N.D. Ill. 2000). However, Defendant is entitled to state what amount of compensation she deems proved and to ask the jury to use reason in assessing the amount of damages, if any. *Id.*

### h. Plaintiff's Motion No. 8 to Bar Defendant From Commenting on the Consequences of a Judgment against Defendant [262, at 2–3]

Plaintiff moves to bar Defendant from asking the jury to place itself in Defendant's shoes. Defendant does not intend to make this argument, thus this motion is granted.

Plaintiff also moves to bar Defendant from expressing any personal belief about the merits of the issues of fact or vouching for the credibility of any witness. Defendant does not object to this motion, as long as it is not seeking to preclude counsel from pointing out to the jury that it is entitled to weigh the credibility of the parties, witnesses and defenses. The motion is granted.

Plaintiff moves to bar Defendant from commenting on the ease with which lawsuits can be filed. Defendant does not object to this motion, and thus it is granted.

Plaintiff moves to bar Defendant from commenting that judgment against Defendant would cause financial harm or burden, or would burden the public as a whole, increase taxes, or increase the City of Chicago budget problems and the Police Department financial difficulties. Defendant does not intend to introduce such evidence or argument, thus the motion is granted.

**i. Plaintiff's Motion No. 9 to Bar Defendant and Defendant's Attorneys and Witnesses from Implying That They Have Personal Knowledge of Facts Not Before the Jury [262, at 3]**

Plaintiff also seeks to bar Defendant's counsel from offering counsel's own testimony or supplying facts not based on evidence properly in the record. Defendant does not object to this motion, thus it is granted.

**j. Plaintiff's Motion No. 10 to Bar an Argument that Plaintiff is Required to Prove a Certain Specific Dollar Amount to be Compensated for Non-Economic Damages [262, at 3–4]**

Defendant does not object to this motion, thus it is granted.

**k. Plaintiff's Motion No. 11 to Bar Reference to Attorneys' Fees [262, at 4]**

Plaintiff moves to bar introduction of any evidence as to the circumstances under which the attorney for the Plaintiff was employed or retained, or the fees or the contract under which the attorney has been retained. Defendant does not object to this motion, thus it is granted. Moreover, given that attorneys' fees will be a matter for the Court to address in the event that the jury returns a verdict for the Plaintiff, the Court cannot envision any scenario in which it would be proper for either side to raise the subject of attorneys' fees in the presence of the jury.

**l. Plaintiff's Motion No. 12 to Bar Reference to Matters for Which Discovery was Denied to Plaintiff [262, at 4]**

Plaintiff seeks to bar introduction of any evidence or testimony on matters for which discovery was denied to Plaintiff based on the bifurcation of claims against the City from the claims against Defendant Acosta, individually. Defendant does not intend to make such arguments or introduce such evidence, and thus the motion is granted.

C.      **Defendant's Motions** *in Limine*

   1.      **Defendant's Motion No. 1 to Bar Reference to Any Violation of Police Regulations [257, at 1]**

Defendant moves *in limine* to bar Plaintiff from presenting evidence, testimony, or argument that Defendant or any other officer violated any City of Chicago general orders or policy. Defendant argues that at issue is whether Defendant violated Plaintiff's constitutional or state law rights and that whether Defendant or any other officer violated Chicago Police Department rules, state statutes, local ordinances, or administrative or department regulations is irrelevant and immaterial. Fed. R. Evid. 401, 402. According to Defendant, evidence that Defendant or another officer violated police regulations would be overwhelmingly prejudicial.

Although "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of * * * departmental regulations and police practices," *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003), there is no categorical bar preventing parties from introducing such evidence. Generally, "any attempt to use violations of CPD General Orders or other policies and procedures as prima facie evidence of a constitutional violation is prohibited." *Gonzalez v. Olson*, 2015 WL 3671641, at *13 (N.D. Ill. June 12, 2015). Further, any alleged violation of a particular general order is not relevant, as it sheds no light on whether Defendant violated Plaintiff's constitutional rights. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (the text of a specific CPD General Order regarding the use of force was not relevant in determining whether the officer violated the plaintiff's Fourth Amendment rights by using excessive force). However, the parties may still argue generally about training and practices without referring directly to specific orders, as Defendant concedes that how officers are trained

can be relevant to what a reasonable officer would have done, which goes to the issue of whether there was probable cause.[6]  [274, at 7–8.]

Accordingly, Defendant's motion is granted in part and denied in part.  Defendant's motion is granted to the extent that Plaintiff seeks to refer to specific general orders, or suggest that violations of police department rules and regulations constitute constitutional violations, or argue that such violations have a tendency to make the existence of a Constitutional violation more probable.  See *Walker v. Saenz*, 1992 WL 317188, at *4 (N.D. Ill. Oct. 27, 1992) (holding that introduction of evidence for this purpose would be unduly prejudicial to defendants, as the jury "might improperly assume that violation of police regulations also constitute a Constitutional violation").  However, the parties are permitted to elicit relevant testimony about training and practices in general.

### 2.      Defendant's Motion No. 2 to Bar Reference to the City's Indemnification of Defendant [257, at 3]

Defendant moves *in limine* to bar Plaintiff from presenting testimony, evidence, or argument that Defendant may be indemnified by the City for any compensatory damages entered against her and that the City is paying for the defense of the case.

"In the general case courts exclude evidence of indemnification out of a fear that it will encourage a jury to inflate its damages award because it knows the government—not the individual defendants—is footing the bill."  *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998); see also *Kemezy v. Peters*, 79 F.3d 33, 37 (7th Cir. 1996) ("When the defendant is to be fully indemnified, such evidence, far from being required, is inadmissible").  However, if a

---

[6] The Court reiterates that Plaintiff's counsel did not cite to any specific General Orders when asked at the final pre-trial conference.  [See 286, at 28.]  Plaintiff's counsel stated that he may wish to bring up at trial the vice control section investigative guidelines in order to make the argument that Defendant was never part of the vice control unit and thus was not trained in vice control.  Plaintiff is permitted to make this argument about a lack of vice control training in general, without referring to any specific section of the vice control section investigative guidelines.

defendant who benefits from a right to indemnification nevertheless claims an inability to pay damages, the defendant is deemed to have "opened the door" to evidence of indemnification. *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1030–31 (N.D. Ill. 2011) ("[Plaintiff] is barred from * * * presenting any evidence or testimony that the defendants may be indemnified by the City of Chicago for damages. However, if the defendants plead poverty as to any damages, [plaintiff] may offer evidence of indemnification."); see also *Gonzalez*, 2015 WL 3671641, at *7 ("Evidence of indemnification is generally inadmissible, * * * [b]ut if Defendants plead poverty as to punitive damages, they open the door for Plaintiff to offer evidence of indemnification as to compensatory damages.").

Defendant's motion is granted in part and denied in part. Evidence of indemnification is inadmissible, unless Defendant opens the door by bringing Defendant's personal financial circumstances into the case or suggesting any hardship on Defendant in conducting the defense. Here, Plaintiff is seeking $250,000 in punitive damages. If Defendant chooses to "apprise the jury of the fact that [Defendant] will have to bear [punitive] damages out of [her] own pockets," then "fairness would dictate that the jury also be informed of the true situation (indemnification) as to compensatory damages." *Galvan v. Nordberg*, 2006 WL 1343680, at *2 (N.D. Ill. May 10, 2006). Thus, if Defendant offers evidence of her financial circumstances, the Court will instruct the jury that the City indemnifies for compensatory damages, but not for punitive damages, and that the jury is to consider Defendant's financial information only for its valuation of the punitive damages, if any, that it would award in this case.

### 3. Defendant's Motion No. 3 to Bar Any Medical Opinion by Dr. Michael Close [257, at 4]

Plaintiff claims that his onset of shingles and post-herpetic neuralgia were caused by the stress of his arrest and the related proceedings. Dr. Mario Silva treated Plaintiff's shingles, and

Dr. Michael Close treated Plaintiff's post-herpetic neuralgia. Defendant moves *in limine* to bar any medical opinion by Dr. Close, who is a fact witness, not an expert witness. Dr. Close testified that he believed Plaintiff's shingles were caused by the stress from the arrest. Defendant argues that as a fact witness, Dr. Close cannot offer any expert opinion as to Plaintiff's condition apart from what he wrote in the medical records and cannot give a causation opinion. Defendant contends that she has not received notice of opinion testimony by Dr. Close in support of Plaintiff's claims and therefore would be substantially prejudiced by its introduction.

Plaintiff argues that Dr. Close should be permitted to offering opinion testimony on causation, diagnosis, and treatment of Plaintiff without complying with the prerequisites of Federal Rule of Evidence 26(a)(2)(B) because Dr. Close's opinion about the causation of Plaintiff's condition was a necessary part of the treatment of the condition. Plaintiff contends that since Dr. Close's treatment of Plaintiff was disclosed and Defendant deposed Dr. Close, Defendant would not be prejudiced by Dr. Close's opinion testimony.

Rule 26(a)(2)(B) provides that if a witness is "retained or specially employed to provide expert testimony in the case," then the party presenting the witness must disclose a written report containing, among other requirements, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Evid. 26(a)(2)(B). The Seventh Circuit has held that

> a treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one "retained or specially employed to provide expert testimony in the case," and thus is required to submit an expert report in accordance with Rule 26(a)(2).

*Meyers v. National R.R. Passenger Corp.*, 619 F.3d 729, 734–35 (7th Cir. 2010); *see also*

*Banister v. Burton*, 636 F.3d 828, 833 (7th Cir. 2011) ("*Meyers* applies to a physician's opinion

as to the *cause* of an injury determined for the purpose of litigation[.]").  If a treating physician limits his testimony to his observation, diagnosis, and treatment, then a Rule 26(a)(B) report is not required.  *Krischel v. Hennessy*, 533 F. Supp. 2d 790, 795 (N.D. Ill. 2008).  Additionally, in some cases, the treating physician may form an opinion about causation "as a necessary part of the treatment rather than at the request of counsel, and the purposes of Rule 26 may be satisfied without a formal report."  *Id.*  However, a treating physician who testifies as to causation is often "going beyond what he saw and did and why he did it.  He is going beyond his personal involvement in the facts of the case [and] giving an opinion that he formed *because there is a lawsuit.*"  *Id.*

Here, there is no evidence that Dr. Close reached his opinion that Plaintiff's shingles were caused by the stress of his arrest during the course of his treatment.  Dr. Close testified that the record from Plaintiff's first visit with Dr. Close in August 2010 states that Plaintiff suffers from post-herpetic neuralgia from shingles but that there are "no stressors" and "the shingles [have been] resolved except for pain."  [274, Exhibit 1, at 32:3–8.]  Further, although Dr. Close testified that Plaintiff told him about his arrest, Dr. Close conceded that there is no record of Plaintiff having stress in his medical records. [274, Exhibit 1, at 95:2–12; 107:2–11.]

Thus, Defendant's motion is granted to the extent that Dr. Close is not permitted to give a causation opinion that was not formed in the course of his treatment of Plaintiff and was not recorded in his medical records.  If Plaintiff had wanted to present Dr. Close as an expert and elicit from him a causation opinion, he should have disclosed Dr. Close as such and complied with Rule 26.  However, Dr. Close is permitted to testify as a fact witness as to his treatment of Plaintiff.

### 4. Defendant's Motion No. 4 to Bar Unrelated Citizen Complaints and Lawsuits [257, at 5]

During discovery, Plaintiff was provided with a list of complaints against Defendant and the other officers who are no longer defendants in this case. None of the complaints against Defendant were sustained, and Defendant has not had any other lawsuits filed against her in her capacity as a police officer.

Defendant contends that two complaints were filed against her: one arising from an incident in April 2000 and one arising from an incident in January 2010. The complaints were investigated by the Internal Affairs Division or the Office of Professional Standards / Independent Police Review Authority, but neither complaint was sustained. Defendant offers two arguments for why neither complaint should be admissible. First, since the allegations of misconduct were not sustained, they have little probative value. Second, since they were not sustained, introduction of these complaints would create an unnecessary sideshow about Defendant's alleged role in an incident that is not at issue in this trial. See Fed. R. Evid. 403, 611. Plaintiff does not describe how, if at all, he seeks to bring in this information about the two complaints filed against Defendant. Further, the Court agrees that these complaints have little probative value since they were not sustained, yet have high prejudicial value and risk creating an unnecessary sideshow. Thus, this motion is granted to the extent that Defendant seeks to bar reference to these two unsustained complaints against Defendant.

Plaintiff argues that "information contained in the records of complaints and lawsuits over solicitation sting arrests contain highly relevant information about the way that [Defendant] and her team customarily conducted such arrests" and that such matters should be admitted to show habit or routine practice under Federal Rule of Evidence 406. Plaintiff provides one example of how he seeks to use information from a prior lawsuit involving Officer Coffee, who

was formerly a defendant in this suit. Officer Coffee was a defendant in a separate § 1983 suit, *Palacios v. City of Chicago*, et al., Case No. 07-cv-4568 (N.D. Ill.), related to a different prostitution solicitation sting operation. Plaintiff alleges that Defendant was on medical leave during the time of the sting at issue in *Palacios*. In Plaintiff's view, *Palacios* is relevant because former defendants Officers Coffee and Herrara were involved in the *Palacios* sting operation, and Defendant has testified that members of her police team employed customary practices in conducting solicitation sting operations. Plaintiff states that he anticipates that the testimony of the police officers at trial regarding the manner in which the team conducted prostitution solicitation sting operations will not be consistent with Officer Coffee's sworn testimony from *Palacios* and that the officers will assert a lack of memory as to these practices. Plaintiff argues that barring him from using information pertaining to other prostitution solicitation sting operation litigation would deprive Plaintiff of highly relevant and necessary information about the way Defendant and her team routinely conduct such arrests.

Plaintiff's arguments fail for several reasons. First, based on the excerpts of Officer Coffee's testimony in *Palacios*, the Court is not convinced that the deposition shows "an organization's routine practice" under Rule 406 or "modus operandi" ("M.O.") under Rule 404(b). To the extent that Plaintiff would like the jury to draw an inference from the practices (or M.O.) to which this evidence pertains, it is not a permissible one (*e.g.*, one can infer the identity of the officers from their routine practice), but rather an impermissible one (*e.g.*, because they made bad arrests using these practices before, they made a bad arrest of Plaintiff). Second, even if the Court were not concerned about propensity inferences, the injection of these other incidents into this trial raises significant Rule 403 problems. It is Defendant's individual conduct that is at issue in this case, not the practice of the police team, and a group's practice cannot be

attributed to an individual member. *United States v. Angelilli*, 660 F.2d 23, 41 (2d Cir. 1981) (cannot attribute group's practice to an individual member). References to prior lawsuits against the officers on Defendant's team (who are no longer defendants themselves) have a high risk of prejudice, especially in those instances where Defendant herself was not even present. In addition, the presentation of evidence that one or both sides may offer to place each separate incident in context certainly would lead to a major sideshow that could confuse the jurors.

Thus, the Court grants Defendant's motion to bar reference to *Palacios* and other unrelated lawsuits. Plaintiff will still be able to show how Defendant and her team operate, as he can elicit testimony about what Defendant and her fellow officers were planning for the day, how they communicated about what they were going to do, and why they were in that location. To the extent that Plaintiff seeks to use Officer Coffee's deposition in *Palacios* for impeachment purposes should Coffee testify at trial, the Court defers ruling. Should either party seek to introduce any evidence of this nature for impeachment during trial, counsel should request a sidebar beforehand to allow the Court to rule on its admissibility outside of the presence of the jury.

### 5. Defendant's Motion No. 5 to Bar Any Reference to an Audio Recording [257, at 9]

Defendant moves to bar any reference "to a non-existing audio recording" of the exchange between Plaintiff and Defendant. Defendant testified that she was not wearing a wire, a radio, or any other device by which her follow officers or anyone else could hear what she and Plaintiff said to each other. Plaintiff's attorney claimed at Plaintiff's criminal trial that there exists an audio recording containing radio transmissions of the encounter between Plaintiff and Defendant, yet it does not appear that anyone can produce any such audio recording. Defendant argues that any reference to this alleged audio recording would be unduly prejudicial. Plaintiff

argues that whether or not Defendant was wearing a wire at the time of the arrest is a disputed issue for trial, and if Defendant was wearing a wire, a recording would have been made.

Plaintiff has offered no evidence that a recording exists, other than Plaintiff's testimony that when he was in the rear seat of the police vehicle after his arrest, he allegedly heard Defendant's voice from the police radio describing what was occurring as the officers completed two more arrests. [272, at 10.] The Court is unwilling to permit what would surely be a lengthy sideshow regarding ancillary "missing evidence." *Martinez v. City of Chicago*, 2016 WL 3538823, at *7 (N.D. Ill. June 29, 2016) (granting motion *in limine* to bar evidence of defendants' alleged failure to preserve video footage from the officers' vehicles to avoid an unnecessary sideshow). Thus, Defendant's motion is granted. Plaintiff is free to testify that while he was sitting in the back of Officers Matich and Coffee's police vehicle, he heard what he believed to be Defendant's voice on the police radio, describing what was occurring in two subsequent arrests. Defendant is permitted to testify that she was not wearing a wire. But the Court will not permit a lengthy sideshow about whether or not there exists an audio recording of Plaintiff's arrest. See Fed. R. Evid. 403, 611.

### 6. Defendant's Motion No. 6 to Bar the Findings in the Impound Proceedings and the Inspector General's Investigation [257, at 11]

Defendant moves *in limine* to bar the findings in the impound proceedings, the investigation of the Inspector General of the City of Chicago ("IG") relating to Plaintiff's arrest, and any related hearsay or impressions of credibility. Defendant's motion is granted in part and denied in part. The Court concludes that the disposition of the impound proceedings and the IG's investigation can come in as evidence but that the parties are barred from introducing the Impound Hearing Officer's and the IG's reasoning and impressions of credibility.

Plaintiff's vehicle was impounded following his arrest. After a hearing, the Impound Hearing Officer found for Plaintiff, explaining that the City had not proven by a preponderance of the evidence that Plaintiff "repeatedly beckon[ed] to, or repeatedly attempt[ed] to engage" Defendant or "repeatedly interfere[d] with the free passage of other persons, for the purpose of * * * soliciting for a prostitute" in violation of Municipal Code Chapter 8-8-060(b). Thus, the Impound Hearing Officer concluded that there was insufficient evidence that Plaintiff violated Municipal Code Chapter 8-8-060(b), as alleged by the City.[7] The Impound Hearing Officer also stated that in his view, Defendant "offer[ed] the more credible evidence in the case."

Defendant contends that the City's attorney for the impound proceedings should have argued that Plaintiff's vehicle was impounded under a different subsection of the Municipal Code, subsection (d)(1), and that the City would have been able to meet its burden under subsection (d)(1).[8] Defendant further argues that the law that the Impound Hearing Officer applied is not the same law that the jury will be applying to the facts at trial and that permitting the jury to hear that the Impound Hearing Officer concluded that the City did not meet its burden in showing that it was justified in impounding Plaintiff's vehicle would be unduly prejudicial.

Additionally, the IG investigated the solicitation allegations against Plaintiff because he was a City employee. For several reasons, including the fact that the criminal charges against Plaintiff had been dropped and doubts about Defendant's credibility, the IG concluded that the investigation should be "closed not sustained." [257, Exhibit 10.] As part of its investigation,

---

[7] Municipal Code Chapter 8-8-060(b) states:

> Any person who remains or wanders about in a public place and repeatedly beckons to, or repeatedly attempts to engage, passerby in conversation, or repeatedly interferes with the free passage of other persons, for the purpose of prostitution or of soliciting for a prostitute, shall be guilty of a violation of this section.

[8] Municipal Code Chapter 8-8-060(d)(1) states: "A motor vehicle that is used in * * * soliciting for a prostitute * * * shall be subject to seizure and impoundment under this subsection * * *."

the IG also considered the basis for the State's Attorney's decision to dismiss the solicitation charge against Plaintiff. The Assistant State's Attorney ("ASA") on the case explained that the charges were dropped because the State was not ready for trial. He also explained that the previous ASAs assigned to the case had concerns about Defendant's credibility because of the discrepancies about whether or not audio surveillance footage of the alleged solicitation existed. Finally, the IG reviewed transcripts from the administrative impound hearing and noted inconsistencies between Defendant's account of the event and the arrest report, including inconsistencies about whether Plaintiff's vehicle was tan or silver, whether or not Plaintiff was read his *Miranda* rights, and the exact wording of the solicitation. [257, Exhibit 10, at 2–3.]

Defendant argues that the IG's findings and statements made by the IG and the ASAs in the course of the investigation should be barred because there is no reason for the jury to hear the IG's findings or the IG and the ASAs' impressions of Defendant's credibility. Defendant contends that the IG's finding of "not sustained" is simply a finding that there was insufficient evidence to sustain the allegations against Plaintiff, not a finding that Defendant lacked probable cause to arrest Plaintiff. Further, Defendant contends that because the comments were by an "Inspector General" and "Assistant State's Attorneys," which are titles that potentially carry authoritative weight, the jury may be influenced to disregard their own responsibility as fact-finders and give the IG and ASAs' impressions of credibility undue weight.

Defendant's motion is granted in part and denied in part. In *Schultz v. Thomas*, the Seventh Circuit held that in a § 1983 false arrest and excessive force action against police officers, the credibility findings of the state court judge from the underlying state criminal trial were inadmissible. 832 F.2d 108, 110 (7th Cir. 1987). The district court had denied the defendant police officers' motion *in limine* and permitted the state court judge to testify to the

findings of fact and conclusions law contained in his opinion. *Id.* at 109. A transcript of the state court judge's decision was also admitted into evidence. *Id.* The Seventh Circuit held that the district court abused its discretion, explaining that the state court judge's testimony and decision "unavoidably overlapped the jury's role in assessing the credibility of key witnesses as to unfairly prejudice the defendants by denying them the right to have a jury decide the facts which formed the claims against them." *Id.* at 110. Moreover, the Seventh Circuit reasoned that the state court judge was not a witness to the events in question, and thus, under Federal Rule of Evidence 602, the state court judge could not properly give his opinion on what had transpired on the day of the arrest. *Id.* at 111; Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced to sufficiently support a finding that he has personal knowledge of the matter."). Finally, the Seventh Circuit explained that the state court judge's findings on credibility could not be admitted under Federal Rule of Evidence 608, which states that "[a] witness's credibility may be attacked * * * by testimony in the form of an opinion about [the witness's character for untruthfulness]." Fed. R. Evid. 608. Since the state court judge was not witness to nor did he have any personal knowledge of the underlying facts, he had no basis for his opinion about defendants' truthfulness other than his own credibility observations during the state court trial. *Schultz*, 832 F.2d at 111. "No person, especially a judge, should usurp the jury's exclusive duty to determine credibility." *Id.*

Applying these principles to the case at hand, the reasoning and impressions of credibility of the Impound Hearing Officer, the IG, and the ASAs are not admissible. Allowing reference to their opinions about the credibility of Defendant would invade the province of the jury in assessing the credibility of testifying witnesses. *Id.* at 110-11; see also *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 919 (8th Cir. 1986) (affirming district court's refusal to admit text of an

arbitration decision because it could "usurp the jury's role in assessing credibility or would be unfairly prejudicial"); *Ryan v. Koester*, 2013 WL 6659847, at *3 (C.D. Ill. Dec. 17, 2013) (holding that based on *Schultz*, 832 F.2d at 110, the opinions or findings of state court judges from the plaintiffs' statutory summary suspension hearings, including comments on credibility, would not be admissible at trial); cf. Fed. R. Evid. 604 ("The presiding judge may not testify as a witness at the trial."). Thus, the Court concludes that the parties are barred from introducing the Impound Hearing Officer's and the IG's reasoning and impressions of credibility.

However, the dispositions of the impound proceedings and the IG's investigation are admissible. The outcomes of these proceedings are not relevant to Plaintiff's malicious prosecution claim, as Plaintiff attempts to argue, as the malicious prosecution claim only goes to the underlying criminal prosecution.[9] Nevertheless, the outcomes of these proceedings are relevant to the existence and extent of damages. For example, Plaintiff may testify as to the proceedings he was required to prepare for and attend, any legal expenses that he incurred in connection with those proceedings, and the effects of those proceeding on his physical and mental health as well as his finances. Further, Plaintiff is not restricted in any proper uses at trial of the underlying evidence that was considered by the Impound Hearing Officer or IG. Statements made by Plaintiff or Defendant during these proceedings are admissible as statements of a party opponent. Fed. R. Evid. 801(d)(2). With that said, the Court reminds the parties that it

_____

[9] As discussed at the final pre-trial conference, Plaintiff will be permitted to testify to the circumstances surrounding the disposition of the criminal case against him. For the reasons discussed on the record, Plaintiff's lead counsel at his criminal trial (Peter Cantwell) will not be allowed to testify, as he also is lead counsel in the instant civil case. On October 28, 2016, Plaintiff filed a motion [287] seeking leave to add former Assistant State's Attorney Ian Cooper as a "will call" witness and former co-defense counsel Paul Hammond as a "may call" witness at trial. Plaintiff seeks to add both witnesses to address the termination of his state criminal proceedings. The Court will set a briefing schedule on the motion in a separate order and will discuss the motion with counsel prior to bringing in the prospective jurors on the first day of trial.

will not permit a sideshow on the impoundment proceeding and the IG investigation, as the jury is not being asked to retry these proceedings. See Fed. R. Evid. 403, 611.

### 7. Defendant's Motion No. 7 to Bar Reference to a Conspiracy [257, at 16]

Defendant moves to bar any evidence, testimony, or argument that Defendant and any other police officer witness were involved in a conspiracy. Defendant points out that the Court granted summary judgment in favor of Defendant and the former defendant officers on Plaintiff's conspiracy claims under § 1983 and state law, concluding that "Plaintiff has failed to come forward with any evidence that Defendant Officers entered into an express or implied agreement with each other to deprive Plaintiff of his constitutional rights and that there was an actual deprivation of those rights in the form of overt acts in furtherance of the agreement." [217, at 17.] Defendant argues that Plaintiff should thus be barred from arguing or implying that the police officers were involved in a conspiracy either before or after Plaintiff's arrest or at any other time. According to Defendant, such evidence is irrelevant to the question of whether Defendant had probable cause to arrest Plaintiff, since Defendant, alone, decided that probable cause existed. Defendant also contends that evidence is prejudicial and would confuse the issues and mislead the jury.

Plaintiff argues that Defendant and her fellow officers "jointly scheduled and planned in advance their solicitation sting operations" and "worked as a team with previously agreed to roles for the participating officers." In Plaintiff's view, omitting any element of the officers' planning and agreement would create a misleading account of the facts.

Defendant's motion is granted in part and denied in part. Even though Plaintiff no longer has a viable conspiracy claim, Plaintiff can argue that the officers "jointly scheduled and planned in advance their solicitation sting operations" and "worked as a team with previously

agreed to roles for the participating officers." See *Hallett v. Richmond*, 2009 WL 5125628, at *6 (N.D. Ill. May 15, 2009) (explaining that "just because this court found the evidence insufficient to support plaintiff's claim for conspiracy to violate plaintiff's constitutional rights" does not mean that evidence tending to show that defendants worked together in some fashion is irrelevant); cf. *Hillard v. City of Chicago*, 2010 WL 1664941, at *3 (N.D. Ill. Apr. 23, 2010) ("Even absent a conspiracy claim, Plaintiff is entitled to some leeway to argue the defendant officers and witness officers are covering for each other."). The Court is not convinced that Plaintiff's argument that the officers worked together in some manner is irrelevant. Whether the officers worked together to plan their sting operations can go to witness bias, for example, and this evidence may affect the weight the jury gives to the officers' testimony. See *Gonzalez v. Olson*, 2015 WL 3671641, at *14 (N.D. Ill. June 12, 2015); *Graham v. Bennett*, 2007 WL 781763, at *1 (C.D. Ill. Mar. 12, 2007). To the extent Defendant is concerned about the use of the word "conspiracy" confusing the issues and misleading the jury, the Court directs Plaintiff to instead speak in terms of a "team effort" or similar terminology. See *Gonzalez*, 2015 WL 3671641, at *14.

However, the Court cautions Plaintiff that it will not permit a sideshow on the issue of conspiracy, which is not properly before the jury. See Fed. R. Evid. 403, 611. Consistent with the Court's grant of summary judgment in favor of the defendant officers on the conspiracy claim [274, at 17], Plaintiff is not permitted to argue that the officers conspired with each other to deprive Plaintiff of his constitutional rights

### 8. Defendant's Motion No. 8 To Bar Reference to the *Monell* Claim [257, at 17]

Defendant moves to bar Plaintiff from referring to any claims against the City and from arguing or eliciting testimony regarding alleged unconstitutional City policies or that the City

improperly trains, disciplines, or monitors its police. Defendant argues that disclosure of the bifurcated *Monell* claim to the jury would invite confusion and unfair prejudice. In Defendant's view, an argument that the City improperly trains its police officers and that Defendant was not trained on how to conduct prostitution missions is irrelevant and highly prejudicial.

Plaintiff argues that concealment of the *Monell* claim will cause confusion and mislead the jury. Plaintiff contends that he has "no interest in shifting responsibility or blame from the police officer to the City," but wishes to present evidence and argument that Defendant's actions were inconsistent with police officer training.

Defendant's motion is granted in part and denied in part. The Court is cognizant of the complications arising from the bifurcation of the *Monell* claim. The Court agrees with Defendant that the jury should not be informed that there is a parallel *Monell* claim against the City, as that would cause confusion about what the jury's role is in the case at hand. However, Plaintiff is permitted to elicit testimony about how Defendant and her fellow officers set up the prostitution sting operation and whether their actions and decisions about the location of the operation and other details are consistent with their understanding of the department's policies and their own training as police officers. As noted above, Defendant acknowledges that how officers are trained can be relevant to what a reasonable officer would have done, which goes to the issue of whether there was probable cause. [274, at 7–8.] Thus, Plaintiff can offer evidence of Defendant's training or lack of formal training in prostitution arrests, and Defendant can challenge this evidence on cross-examination.

### 9. Defendant's Motion No. 9 to Bar the Opinions of Plaintiff's Expert, Dr. Edward Keuer [257, at 18]

This motion is discussed above in Section II *Daubert* Motions.

### 10. Defendant's Motion No. 10 to Bar Reference to Discovery [257, at 22]

Defendant moves to bar Plaintiff's counsel from commenting on discovery in the presence of the jury. Defendant acknowledges Plaintiff's dissatisfaction with not receiving certain *Monell*-related discovery and seeks to prevent Plaintiff's counsel from implying that Defendant has not complied with certain discovery request or that Plaintiff is disadvantaged because of certain documents he has not received. Defendant argues that comments on discovery are irrelevant and would confuse the jury.

Plaintiff argues that if Defendant offers evidence of alleged citizen complaints about prostitution, then Plaintiff should be able to respond to such an argument by saying he was denied discovery on this matter. Defendant agrees not to make an argument about alleged citizen complaints about prostitution, and, as noted above, the Court grants Plaintiff's motion [259] to bar testimony of citizen complaints about prostitution. Thus, Defendant's motion to bar reference to discovery in the presence of the jury is granted.

## IV. Conclusion

For the reasons set forth above, Plaintiff's *Daubert* motion to bar expert testimony by Dr. Richard McPartlin [243] is denied. Defendant's motion [257 No. 9, at 18] to bar expert testimony by Dr. Edward Keuer is denied.

Plaintiff's motion [258] to bar reference to harassment allegations by Donna Smith is granted. Plaintiff's motion [259] to bar testimony of citizen complaints about prostitution is granted. Plaintiff's motion [260] to bar evidence of disciplinary action for misuse of his work computer is granted in part and denied in part. Plaintiff's motion [261] to bar reference to Defendant's cancer condition is granted. Plaintiff's omnibus motion *in limine* [262] is granted in part and denied in part: the Court grants Plaintiff's motion No. 1 [262, at 1], motion No. 2 [262, at 1], motion No. 3 [262, at 1–2], motion No. 4 [262, at 2], motion No. 5 [262, at 2], motion No.

7 [262, at 2], motion No. 8 [262, at 2–3], motion No. 9 [262, at 3], motion No. 10 [262, at 3–4], motion No. 11 [262, at 4], and motion No. 12 [262, at 4]; the Court denies Plaintiff's motion No. 6 [262, at 2].

Defendant's motions *in limine* [257] are granted in part and denied in part: the Court grants Defendant's motion No. 4 [257, at 5], motion No. 5 [257, at 9], and motion No. 10 [257, at 22]; the Court grants in part and denies in part Defendant's motion No. 1 [257, at 1], motion No. 2 [257, at 3], motion No. 3 [257, at 4], motion No. 6 [257, at 11], motion No. 7 [257, at 16], and motion No. 8 [257, at 17]. This case remains set for a jury trial to commence on November 7, 2016. The Court reminds the parties to submit revised exhibit lists that take into account the Court's rulings above no later than the close of business on Thursday, November 3, 2016.

Dated: November 1, 2016

_____
Robert M. Dow, Jr.
United States District Judge